UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEVE DABSON, : | |
|     Plaintiff, : | CIVIL ACTION NO. |
| : | 3:14-CV-676 (JCH) |
| v. : | |
| : | |
| PENSKE TRUCK LEASING, : | AUGUST 14, 2015 |
|     Defendant. : | |

**RULING RE: DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. No. 44)**

**I.    INTRODUCTION**

Plaintiff Steve Dabson brought this lawsuit in state court against Penske Truck Leasing ("Penske"), his former employer, after Penske terminated his employment. Dabson claims that Penske violated Title VII of the Civil Rights Act and the Connecticut Fair Employment Practices Act ("CFEPA") by unlawfully discriminating against him on based on his race or national origin and retaliating against him for complaining about a hostile and discriminatory workplace.  See Notice of Removal (Doc. No. 1), Ex. A, Amended Complaint; see also Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem. Opp'n") (Doc. No. 61) at 1–4. Penske removed the case to this court and filed a counterclaim against Dabson.  See Amended Answer, Affirmative Defenses & Counterclaim (Doc. No. 27).  After discovery, Penske filed a Motion for Summary Judgment (Doc. No. 44) on all claims, including its counterclaim.

For the reasons that follow, the court grants Penske's Motion except as to its counterclaim, over which the court declines to exercise supplemental jurisdiction.

1

## II.     FACTS

Unless otherwise noted, the following facts are undisputed.[1]  Penske hired Dabson as a part-time Rental Representative on June 7, 2010.  Plaintiff's Local Rule 56(a)2 Statement (Doc. No. 61-2) ("Pl.'s L.R. 56(a)2 Statement") ¶ 1.[2]  As set out in the Employee Truck Rental Rates policy (the "Rental Policy"), Penske allows employees to rent its trucks at discounted rates: $25 per day for a 12-foot truck and $40 dollars per day for a 24-foot truck, plus 10 cents per mile and other applicable charges.  Id. ¶¶ 2–4.  The Rental Policy is available to all employees on the Penske intranet.  Id. ¶ 2.

In August 2012, an employee complained to Consumer Development Manager Sara Racine that Dabson was renting Penske's trucks at rates lower than the employee rates in the Rental Policy.  Id. ¶ 6.  Racine reviewed Dabson's past rentals and discovered issues with two of them.  Id. ¶ 7.

Dabson rented a 12-foot Penske truck on September 23, 2011, and he returned it on September 27.  Id. ¶¶ 8–9.  Dabson paid the employee rental rate for two days.  While Dabson admits that he rented the truck for four days, see id. ¶ 9, and that he paid for two days of rental, see id. ¶ 10, he denies that any amount went unpaid.  Id.  Further, Dabson paid for 150 miles of driving.  Id. ¶ 11.  However, the odometer said that more than 1,600 miles were driven.  See id.

---

[1] To the extent Dabson denies facts, but cites no admissible evidence to support such denial, the court deems those facts admitted unless it found contrary evidence in its own review of the record.  See Johnson v. Connecticut Dep't of Admin. Servs., 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("Where the Plaintiff has objected to Defendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials, or where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted."), aff'd, 588 F. App'x 71 (2d Cir. 2015).

[2] The court generally cites to Dabson's Local Rule 56(a)2 Statement to show Penske's underlying Rule 56(a)1 Statement (Doc. No. 46) and Dabson's response to that statement.

Dabson rented a 26-foot Penske truck on August 13, 2012, and the relevant rental agreement listed August 14 as the return date. Id. ¶ 12. However, Dabson did not return the truck until September 1, 2012, after O'Connor and Michael Flanagan, a District Rental Manager at the time, told him to return it. Id. ¶ 13. Penske then billed Dabson $2,415.90 for the 19-day rental, which included the charges of ten cents per mile driven, the cost of filling the fuel tank with gasoline, and other applicable charges. Id. ¶¶ 14–15. Dabson refused to allow Penske to charge his credit card, and he has still not paid Penske any of the money he owes for the August 2012 rental. Id. ¶¶ 16–17.

Racine shared these issues with Dabson's supervisor, District Manager Stephen O'Connor, id. ¶ 7, and on August 31, 2012, O'Connor and Flanagan confronted Dabson about his September 2011 rental, id. ¶ 19. Dabson was unable to explain why he had only paid for two days and 150 miles with the rental truck, when the records indicated that he had had the truck for four days and that it had been driven 1,805 miles. See id. ¶ 20. Penske then suspended Dabson on August 31, 2012, id. ¶ 21, and it ultimately terminated him on September 4, 2011, id. ¶ 32.

Penske provides evidence that Dabson had a number of work-related performance issues. Specifically, Penske disciplined Dabson in April 2011 for failing to thoroughly inspect returned trucks for damage, in May 2011 for renting an unclean truck to a customer, and in January 2012 after he scored poorly on a secret shopper survey. Id. ¶ 18.

As explained further below, Dabson complains of discrimination in Penske's promotions practice related to a Management Trainee position. Dabson never applied for this position, id. ¶ 22, but he asserts that he expressed interest in it, see Dabson Aff.

3

(Doc. No. 61-3) ¶ 19. The posting for the Management Trainee position stated that a bachelor's degree is required for the position, and Dabson has no such degree. Pl.'s L.R. 56(a)2 Statement ¶¶ 23–24. Dabson asserts that Penske hired white employees who did not possess bachelor's degree for Management Trainee positions, but that he was told, at least implicitly, not to apply for his lack of such a degree. See Dabson Aff. ¶ 22. Dabson complained about this practice in an e-mail to O'Connor soon before he was terminated, see id. ¶ 25, and he alleges that he was terminated because of this complaint.

### III.  STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in

their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**IV.    DISCUSSION**

Dabson makes disparate treatment, disparate impact, and retaliation claims under Title VII and CFEPA.[3]  Penske counterclaims that Dabson owes it for unpaid use of its rental trucks.  The court addresses these claims in turn.

    A.    Disparate Treatment

To establish a disparate treatment claim under Title VII, plaintiffs must show that they were treated less favorably than others simply because of their race, color, religion, sex, or national origin.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  To make this showing, plaintiffs must prove that the employer had a discriminatory motive, which can be established by circumstantial or direct evidence. See, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983). Where a plaintiff can show an employer's discriminatory motive with direct evidence, the burden shifts to the employer to prove that it would have made the same decision without taking into account the plaintiff's race, color, religion, sex, or national origin. See Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1568 (2d Cir. 1989) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (plurality opinion)).

---

[3] Dabson's Title VII and CFEPA claims can be analyzed together.  Tucker v. Journal Register E., 520 F. Supp. 2d 374, 380 (D. Conn. 2007) ("Connecticut courts examine federal precedent for guidance in construing Connecticut's anti-discrimination statutes.  Accordingly, the standards governing Tucker's CFEPA and Title VII claims are one and the same." (internal citations omitted)).

However, where direct evidence is unavailable – as is the case here – and the plaintiff seeks to show the employer's discriminatory motive with circumstantial evidence, the discrimination claim must survive a three-part burden-shifting test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Id. at 802, 805; McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006).  Under this test:

> [The] plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson, 457 F.3d at 215 (internal quotation marks omitted).

To establish a prima facie case of unlawful discrimination under Title VII, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).  Dabson has two theories of disparate treatment, one relating to his termination, and the other relating to his failure to secure a promotion.  The parties dispute on summary judgment only the fourth element of the prima facie case as to both theories.

1.   Failure to Promote[4]

Dabson's first theory is that he was denied a promotion to the Management Trainee position based on his race.  A plaintiff may establish an inference of discrimination in a failure-to-promote claim by showing that similarly situated employee's outside of the plaintiff's protected class were treated more favorably.  See Brodt v. City of New York, 4 F. Supp. 3d 562, 570 (S.D.N.Y. 2014).  The plaintiff must compare himself or herself  to employees who are similarly situated in all material respects to establish such an inference.  See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999).

The parties agree that Penske asserted a policy of requiring Management Trainees to have a bachelor's degree and that Dabson had no such degree.  See Pl.'s L.R. 56(a)2 Statement ¶¶ 23–24.  The parties also agree that Dabson did not apply for the position.  See id. ¶ 22.  However, Dabson provided evidence that he expressed interest in the position, but was told that the position required a bachelor's degree.  See Dabson Aff. ¶¶ 19, 22.  Dabson argues that Penske nominally required candidates to hold a bachelor's degree to qualify for the Management Trainee position but that it promoted white employees to the position who did not hold such a degree.  Specifically, Dabson identifies three white employees whom Penske promoted to the Management Trainee position:  Carrie Preston; Daniel Moore; and Niko Mikolike.  See id. ¶ 22.  With respect to Carrie Preston, O'Connor, who was involved in hiring Management Trainees,

---

[4] Dabson also contends that Penske discriminated against him by refusing to offer him training opportunities.  Aside from asserting that he was denied training, see Dabson Aff. ¶¶ 20–21, he offers no evidence of discrimination related to training.  Dabson requests more time on this point, but he fails to explain why he was unable to conduct discovery during the allotted time.  The court denies this request.

7

testified that Preston had a bachelor's degree when she was hired for the position, O'Connor Aff. (Doc. No. 46-3) ¶ 13,[5] and Dabson provides no basis for his knowledge to the contrary.  Penske admits that Daniel Moore does not have a bachelor's degree, but it provides evidence that it hired Moore as a Management Trainee in September 2006 and that O'Connor was not involved in the decision to hire him.  See id. ¶ 14.  Further, while Moore was promoted to a more senior position – Senior Rental Representative – in March 2010, that position did not require a bachelor's degree.  See id.  Dabson provides no admissible evidence to contradict any of these facts.  Finally, with respect to Niko Mikolike, Penske provides evidence that Mikolike's promotion to Management Trainee was contingent upon his receiving a bachelor's degree.  See id. ¶ 15.  Once again, Dabson offers no admissible evidence to the contrary.  Therefore, Dabson has failed to show that any non-black employee was similarly situated in all material respects and treated more favorably than himself.[6]  Because no reasonable juror could find that Dabson has established a prima facie case of disparate treatment based on his failure to secure a desired promotion, Penske is entitled to judgment as a matter of law on this claim.

---

[5] Dabson argues that O'Connor's statement is inadmissible – presumably as hearsay.  See Pl.'s Mem. Opp'n 12. However, the statement is relevant not for its truth, i.e., for the proposition that Preston, in fact, possessed a bachelor's degree, but for the proposition that O'Connor believed that she did. Dabson's theory is that O'Connor was discriminatorily enforcing the bachelor's degree requirement by representing to Dabson that it was, in fact, a requirement.  If O'Connor believed that Preston had a bachelor's degree, then no inference of discrimination can be drawn from the fact that she was offered the job.

[6] Alternatively, Penske's requirement of a bachelor's degree for the Management Trainee position is a legitimate, non-discriminatory reason not to promote Dabson, and Dabson has failed to provide evidence to infer that this reason was pretextual.

2.  Termination

Dabson's second theory of disparate treatment is that Penske terminated him for engaging in conduct that white employees engaged in without reprimand. As with his failure-to-promote claim, Dabson seeks to make out a disparate treatment claim by showing his employer's more favorable treatment of employees who are outside of his protected class but similarly situated in all material respects. See Norville, 196 F.3d 89, 95 (2d Cir. 1999).

The parties agree that Penske's asserted reason for terminating Dabson was for violating its Rental Policy. See Pl.'s L.R. 56(a)2 Statement ¶ 32; see also O'Connor Aff. ¶¶ 23–24. Dabson asserts that white employees also violated the Rental Policy – by either approving his use of rates that were lower than the discounted employee rate or themselves using these lower-than-acceptable rates – but were not punished for doing so. See Dabson Aff. ¶ 14. He further contends that supervisors were allowed to approve of these lowered rates. See id. ¶ 16. Dabson supports these contentions with two rental agreement documents: one indicates that Dabson's August 2011 rental was "[c]ompleted by" Daniel Moore, id., Ex. E, and the other showing Niko Mikolike creating and completing a July 2012 rental agreement for Dabson of a 24-foot truck for $25 per day, id., Ex. F.[7] Even if this establishes a prima facie case, the court concludes that Penske has offered a legitimate reason for Dabson's termination and that Dabson fails to show pretext.

---

[7] Dabson does not authenticate these documents. Based on the appearance of the documents, the court presumes that Penske produced these documents to him and, by doing so, implicitly authenticated them. See, e.g., John Paul Mitchell Sys. v. Quality King Distributors, Inc., 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) ("[T]he act of production implicitly authenticated the documents.").

### 3. Penske's Reasons for Termination

"The defendant's burden of production also is not a demanding one; [it] need only offer such an explanation for the employment decision." Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999), as amended on denial of reh'g, (Dec. 22, 1999).  Dabson rented a 12-foot Penske truck on September 23, 2011, and he returned it on September 27.  Pl.'s L.R. 56(a)2 Statement ¶¶ 8–9.  Dabson paid the employee rental rate for two days but admits to having the truck for four days.  See id. ¶¶ 8–10.  Further, the odometer indicated that Dabson drove the truck over 1,600 miles, while Dabson only reported driving the truck 150 miles.  See id. ¶ 11.  Dabson then rented a 26-foot Penske truck on August 13, 2012, and the relevant rental agreement listed August 14 as the return date.  Id. ¶ 12.  However, Dabson did not return the truck until September 1, 2012 – only after O'Connor and Michael Flanagan, a District Rental Manager at the time, told him to return it.  Id. ¶ 13.  Dabson refused to pay the bill for his August 2012 rental.  See id. ¶¶ 15–17.  Penske terminated Dabson for a "violation of company policy raising an integrity issue," id. ¶ 32, apparently by (1) applying a daily rate that was below the discounted rate on each of these occasions, (2) recording that he possessed the rented truck for fewer days than he actually had for the September 2011 rental, (3) recording far fewer miles than he actually drove in the September 2011 rental truck, (4) refusing to pay for certain days that he possessed the September 2011 rental truck, and (5) refusing to pay for the full cost of each of the rental trucks.  Dabson's efforts to avoid paying the correct amount for his truck rentals are legitimate reasons for his termination.

4. Pretext

Because Penske has offered legitimate nondiscriminatory reasons for terminating Dabson, "the presumption of discrimination disappears, and the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that" the reason for the adverse employment action "was motivated, at least in part, by discrimination." Tori v. Marist Coll., 344 F. App'x 697, 699 (2d Cir. 2009) (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007)). In some instances, the factfinder may infer intentional discrimination from the falsity of the employer's explanation. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000); see also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases.").

Notably, however,

> [t]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the [adverse employment action]. . . . To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.

Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citations omitted). "[A]bsent direct evidence of bias, a plaintiff must offer concrete evidence of disparate treatment. A plaintiff cannot rely upon 'purely conclusory allegations of discrimination.'" Turner v. NYU Hospitals Ctr., 784 F. Supp.

11

2d 266, 282 (S.D.N.Y. 2011) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)), aff'd, 470 F. App'x 20 (2d Cir. 2012).

Moreover, "it is not the function of a fact-finder to second-guess business decisions." Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). "Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010). The ultimate question is "what motivated the employer; the factual validity of the underlying imputation against the employee is not at issue." McPherson, 457 F.3d at 216 (2d Cir. 2006) (internal citations and quotation marks omitted); see also Katica v. Webster Bank, N.A., No. 13-CV-30072-MAP, 2014 WL 3587383, at *7 (D. Mass. July 18, 2014) ("Defendant's good faith, but mistaken, belief would still constitute a legitimate reason for the termination.").

Dabson has not presented evidence upon which a reasonable jury could find that Penske's asserted reason for termination was pretextual. Dabson offers several pieces of evidence in his effort to show pretext. First, he offers the same evidence that he offered in support of his prima facie case: evidence showing that supervisory white employees applied a rate below that allowed by the Rental Policy. See Dabson Aff. ¶ 16. However, Penske terminated Dabson not for merely paying a lower rental rate, but also for seemingly lying on his rental documentation and for outright refusing to pay for certain days and miles.

Dabson also presents some evidence of O'Connor's conduct in an effort to show pretext. Through Dixon's testimony, Dabson presents evidence that O'Connor was

intent on terminating him, see Dabson Aff., Ex. N, Dixon Dep. 55, and that O'Connor had once indicated that Dixon's African American wife would have trouble finding a job in New England, see id. at 61–63.  However, the record contains no evidence that O'Connor was intent on terminating Dabson based on his race or national origin.  To the contrary, Dixon – on whom Dabson largely relies to create an inference of pretext – testified that he never observed O'Connor engaging in any discriminatory conduct at Penske and that Penske was a safe, discriminatory-free workplace while he worked there.  Pl.'s L.R. Statement 56(a)2 ¶¶ 35–36 (implicitly admitting that Dixon felt this way by stating that Dabson has "insufficient knowledge" to admit or deny Penske's corresponding statement).

Finally, Dabson attempts to show that O'Connor may have erred in concluding that he broke any policy.  For example, he presents evidence that Penske's system for recording the number of miles a particular truck had been driven often resulted in discrepancies.  See Dabson Aff. ¶ 18.  However, he does not deny that he drove the number of miles that O'Connor accused him of driving, instead of the 150 miles that he recorded.  More importantly, Dabson offers no evidence that he had any sort of explanation for the discrepancy at the time O'Connor had to decide whether to terminate him.  See Pl.'s L.R. 56(a)2 Statement ¶ 20 (denying the corresponding statement of fact but failing to cite evidence).

Based on the record before the court, no reasonable jury could find that Penske's asserted reasons for terminating Dabson were pretextual.  Accordingly, the court grants summary judgment on Dabson's disparate treatment claim.

B. <u>Retaliation</u>

Retaliation claims are also analyzed under the burden-shifting framework. <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002). To establish a <u>prima facie</u> case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the protected activity and the adverse employment action. <u>See</u> <u>id.</u> The parties only dispute the fourth element.

Plaintiffs can establish an inference of causal connection based on the temporal proximity between the protected activity and the adverse employment action. <u>Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.</u>, 252 F.3d 545, 554 (2d Cir. 2001). There are no bright lines to define the degree of temporal proximity that may or may not give rise to an inference, and a protected activity that occurred months ago combined can give rise to an inference of termination when there are other facts to suspect retaliation. <u>See</u> <u>id.</u> Conversely, a protected activity that occurred soon before the adverse action will not support an inference if there is little else in the record that would suggest retaliation. <u>See</u> <u>id.</u> "The operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two." <u>Almeida v. Athena Health Care Associates, Inc.</u>, No. 3:07-CV-517 (PCD), 2009 WL 490066, at *11 (D. Conn. Feb. 26, 2009).

Like his disparate treatment claim, Dabson has two theories of retaliation. First, he asserts that Penske terminated him because he had complained of a hostile work environment. Second, Dabson contends that he was terminated because he

complained of (what he believed to be) a discriminatory application of the bachelor's degree requirement for promotion to the Management Trainee position.

Regarding the first of these theories, Dabson has submitted evidence that he complained to O'Connor in March or April of 2011, about employees referring to Dabson with racial slurs. See Dabson Aff. ¶ 9. Further, Dabson provides evidence that O'Connor did not like him and wanted him fired. See id., Ex. N, Dixon Dep. 55 ("[H]e wanted him gone. And he was trying to find any way to do it."). However, Dabson made this complaint over a year prior to his termination, and there is no evidence connecting Dabson's complaint of a hostile work environment to O'Connor's disapproval of him.[8] No reasonable jury could find that Dabson has established a causal connection between this protected activity and his termination.

Regarding the second theory, Dabson sent an e-mail to O'Connor on the morning of September 3, 2012. In this e-mail, after inquiring whether his employment had been terminated or merely suspended, Dabson indicated that he would like to discuss the Management Trainee position, explaining that the position had been given to Preston, who does not have a bachelor's degree. See O'Connor Aff., Ex. B. Penske terminated Dabson the following day. See Pl.'s L.R. 56(a)2 Statement ¶ 32. The court assumes that this close temporal proximity is enough to establish the required causal connection for a prima facie case of retaliation but concludes that, like his disparate

---

[8] The court notes that the record shows that, after Dabson complained about an employee's use of racial slurs, O'Connor told the employee to stop using such language. See Dabson Aff., Ex. C at 23:15–24:10. It is unclear whether the employee in fact stopped using racial slurs, see id., but there is no evidence that Dabson continued complaining or that his complaints were ignored.
  In its Reply (Doc. No. 62), Penske states that Exhibit A to Dabson's Affidavit "does not mention race." Def.'s Reply 6. In fact, Exhibit A clearly states that "[Dabson] feels [other employees] discriminate against him because of his race." Dabson Aff., Ex. A. Counsel who signed the Reply are advised to be more cautious when submitting their pleadings.

treatment claim, Dabson cannot establish pretext.  See Parts IV.A.3–4, supra.  Dabson was already on suspension for his conduct regarding the rental trucks when he sent his e-mail and, aside from the temporal proximity, he presents no evidence that Penske's decision to terminate him was caused by his complaint about the Management Trainee position.  See, e.g., Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.").

      C.    Disparate Impact

Unlike a disparate-treatment claim, a disparate-impact claim requires no showing of discriminatory intent:  "Disparate impact occurs when an employer uses an employment practice that has a disproportionately adverse effect on protected groups." United States v. Brennan, 650 F.3d 65, 90 (2d Cir. 2011).

Dabson argues that "Penske's policies had a disparate impact on Latino [sic] and Blacks at least at the West Haven location."  Pl.'s Mem. Opp'n 17.  He complains that minorities have never been promoted to a management position and that Penske deviated from its written policies to favor white employees.  See id.  Dabson does not identify a specific policy that causes the alleged disparate impact.  See id.  Presumably, he is referring to Penske's policy of requiring a bachelor's degree for certain positions. In any event, Dabson presents no evidence in support of his contention regarding the lack of minorities in management positions.  Dabson also tries to show that black employees were fired at a higher rate than white or Latino employees.  See Dabson Aff. ¶ 22.  However, his evidence simply states that, at certain Penske locations, three white employees, three Latino employees, and five black employees were terminated over a

two-year period.  See Dabson Aff., Ex. M.  This evidence says nothing about the number of white, black, or Latino employees working at those locations.  The court can draw no inference from Dabson's small and isolated data.  Finally, Dabson's claim that Penske deviated from its policies to favor white employees is simply his disparate treatment claim, which the court has already addressed.  See Part IV.A, supra.

Perhaps recognizing his dearth of evidence on this claim, Dabson requests more time to conduct discovery.  Pl.'s Mem. Opp'n 18.  Dabson does not explain why the time he has already had to conduct discovery was insufficient.  He has therefore failed to show "specified reasons" why he "cannot present facts essential to justify [his] opposition" to summary judgment.  Fed. R. Civ. Pro. 56(d).  The court denies his request.

### D. Penske's Counterclaim

Having granted summary judgment on Dabson's claims, the court declines to exercise supplemental jurisdiction over Penske's counterclaim.  See 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the foregoing reasons, the court **GRANTS** Penske's Motion for Summary Judgment (Doc. No. 44) as to Dabson's Title VII and CFEPA claims, and it declines to exercise supplemental jurisdiction over Penske's counterclaim.

**SO ORDERED**.

    Dated at New Haven, Connecticut, this 14th day of August, 2015.

                                    /s/ Janet C. Hall
                                    Janet C. Hall
                                    United States District Judge